## Philadelphia Saving Fund Society, Appellant, *v.* Banking Board of Pennsylvania.

254

Argued May 23, 1955. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Charles J. Biddle,* with him *Ernest L. Nagy,* for appellant.

*Edward L. Springer,* Deputy Attorney General, with him *Joseph L. Cohen,* Assistant Deputy Attorney General, and *Herbert B. Cohen,* Attorney General, for appellees.

*William J. Fuchs* and *John F. E. Hippel,* with them *Edmonds, Obermayer & Rebmann,* for interested parties, under Rule 46.

OPINION BY MR. JUSTICE JONES, November 21, 1955:

This case is here on certiorari to the Banking Board of Pennsylvania for the review of an order of the

Board. The appellees have moved to quash the appeal. The motion must be denied. This court has jurisdiction in the premises; and the certiorari is broad. So much was decided in *Delaware County National Bank v. Campbell*, 378 Pa. 311, 106 A. 2d 416. Contrary to the appellees' contention, the scope of the review on certiorari is not material to a question of jurisdiction. Nor is the breadth of the review retracted, as the appellees further contend, by reason of the fact that the Banking Board disapproved, rather than approved, the appellant's application for an amendment of its charter. The provision in the Banking Code, to which the appellees point, relates to a disapproval by the *Department* of Banking and not by the Banking Board. So far as the finality of an order of the Banking Board is concerned, the Banking Code makes no distinction between an approval and a disapproval by the *Board*. And appellate review is not expressly denied. The questions, therefore, on certiorari to an order of the Banking Board are whether the evidence supports the Board's findings and whether the findings justify the Board's conclusions: see *Delaware County National Bank v. Campbell*, supra.

The present appellant, Philadelphia Saving Fund Society, is a mutual savings bank without capital stock, incorporated under the laws of Pennsylvania and having its principal place of business in Philadelphia. On October 21, 1954, the Society applied to the Department of State for an amendment of its charter so as to permit it to establish a branch in Ardmore, Montgomery County,—a county contiguous to Philadelphia County. This was in accordance with Section 204D of the Banking Code of May 15, 1933, P. L. 624, as amended, 7 PS §819-204D, which provides that "Any institution may, . . . in the manner provided in this act for an amendment to its articles, . . . establish a

branch . . . in any place within any county contiguous to the county in which its principal place of business is located, if the city, borough or other community in which such branch . . . is to be established is without *adequate* banking facilities . . . ."

The Department of State endorsed its approval on the proposed amendment and transmitted the articles to the Department of Banking. That Department, as required by law, caused an investigation to be made of the existing banking facilities in the Ardmore community and, on the basis of such investigation, *approved* the proposed amendment on December 2, 1954. The Department of Banking then forwarded the amendment, as so approved, (together with a copy of the Department's report of its investigation) to the Banking Board for review: see Sec. 204F (2), as amended, of the Banking Code, cite. supra.

The Banking Board held a hearing in the matter on December 16, 1954. The hearing was begun at 10:15 A.M. and was concluded at 11:50 A.M., consuming, all told, one hour and thirty-five minutes; and, the very same day, the Banking Board handed down an adjudication and order disapproving the articles of amendment. Specifically, the order directed that the articles be returned to the Department of Banking, that that Department disapprove them, that it endorse its disapproval thereon and that it then return them to the Department of State. That was done. Thereafter, the Secretary of the Commonwealth returned the articles to the Philadelphia Saving Fund Society with a statement that they had been disapproved. The Society then sued out the writ of certiorari which brought the matter to this court.

Protests by a number of banking institutions against the establishment of the proposed branch had been lodged with the Department of Banking. Some

of the protesting institutions were as far distant from Ardmore as Ambler, Souderton and Hatboro in northern Montgomery County; and a protest was even filed by the Bucks County Bankers Association. There were, in all, eleven such protests, but most of them were not seriously pressed. When the names of the various protestants were called by the Chairman of the Banking Board at the hearing before that body, there was no response whatsoever from seven of them. In the case of two others, their respective representatives answered that they were not filing any brief or making any statement in the case other than the protest already lodged. That left remaining of the protestants only the Bryn Mawr Trust Company (then in the process of absorbing, by merger, the Bryn Mawr National Bank, also a protestant) and the National Bank of Narberth, for which institutions, as well as for the Montgomery County Bankers Association, a joint brief in support of the Board's action has been filed in this court under our Rule 46.

In ascertaining whether the banking facilities in "the city, borough or other community", in which it is proposed to establish a branch, are adequate, it is obviously essential first to determine the extent of the area involved. As it so happens, Ardmore is neither a municipality nor a political subdivision but a geographical designation, partly in Lower Merion Township, Montgomery County, and partly in Haverford Township, Delaware County, embracing a highly developed residential area and an extensive business district along the Lincoln Highway (which bisects the locality in an east-west direction) and in the Ardmore Shopping Center, known as Suburban Square, a block or so to the north of the Lincoln Highway. The designated location of the Philadelphia Saving Fund Society's proposed branch is in the Suburban Square.

The Banking Board found that both the proponents and opponents of the proposed branch recognized that the Ardmore "community" served by existing banking facilities was "the territory within a radius of 2½ miles from the site of the proposed branch office." In that area there are three commercial banks, viz., the two present protestants, the Bryn Mawr Trust Company (with which the Bryn Mawr National Bank is merged), which is two miles distant from the proposed branch, and the National Bank of Narberth, which is likewise two miles distant but has a lately opened branch in Wynnewood which is one mile from the proposed Saving Society branch; the third commercial bank is a branch of The Pennsylvania Company for Banking and Trusts located on the Lincoln Highway in the Ardmore business district one-fifth of a mile from the site of the proposed Saving Society branch. There is also on the Lincoln Highway, not far from The Pennsylvania Company branch, the Lower Merion Federal Savings and Loan Association. It is noteworthy that The Pennsylvania Company, which is by far the largest commercial bank in the locality, has not objected, and makes no objection, to the establishment of a branch of the Philadelphia Saving Fund Society in Ardmore.

The Banking Board did not find, however, that the banking facilities in the Ardmore community were adequate. All that it found with respect to the services performed by the existing banks was "That the aforesaid three banking institutions [Bryn Mawr Trust, Bryn Mawr National and Narberth National] and the branch office of The Pennsylvania Company for Banking and Trusts offer complete and well-rounded banking facilities, including savings account facilities, safe deposit boxes and mortgage loans . . . ." So much may be readily conceded, but that is still a

far cry from a finding that the available banking facilities are adequate to the needs and demands of "the community". Nor was there any evidence before the Board from which a finding of adequacy could have been made. A numerical proportion or relativity cannot be stated on the basis of one factor alone. And, all that was shown by the protesting banks was the amount of their resources, the extent of the banking business they did and the population of the Ardmore "community". They did not show that the banking services they afforded reasonably supplied the requirements of the community. Counsel for the Bryn Mawr Trust Company, by showing a gratifying increase in the number of the bank's depositors and its total resources over the preceding ten years, forthwith assumed the adequacy of that bank's facilities ten years before and then deduced the obvious non sequitur "that if facilities were adequate 10 years ago, . . . they are more than adequate today." The Banking Board's conclusion of law that "the community of Ardmore now has adequate banking facilities and it does not require additional banking facilities at the present time" was a bald and capricious conclusion without a single finding of fact to support it.

On the question of adequacy, the character of the facilities to be offered by the proposed branch bank is, of course, significant. The wording of the statute so imports. In the present instance, the protesting banks are commercial institutions while the proposed branch would be a mutual savings bank. The distinction between the two types of banks is well known. A commercial bank is a business institution which seeks to sell its services at a profit. The services which such a bank renders promote the flow of commerce by affording a more facile transfer of money credits from lender to borrowers. Actually, a commercial bank

functions as a dealer in the commodity of currency for private gainful purposes, and the principal aim of such a bank is to obtain for its owners (i.e., its stockholders) a fair return on their invested capital. On the other hand, the primary purpose of a mutual savings bank is to encourage thrift. It does not engage in the selling of commercial services and, in reality, is nothing more than a cooperative investment association made up for the most part of subscribers who have relatively small financial means. The function of such a bank is to receive small but frequent deposits from a large number of individuals. The aggregate of these deposits is then carefully invested, from time to time, in home mortgages, stocks and bonds, and the resultant income (after proper legal reserves and deductions for operating expenses) is distributed proportionately among the various depositors by way of a dividend. There are no corporate owners of a mutual savings bank to share in its income. The primary aim of a mutual savings bank is a maximum return to depositors with the highest possible degree of financial safety. And, so it is that the savings bank offers the small depositor a sound income-producing investment for his modest means and at the same time affords him a convenient opportunity of home financing.

The distinction between a mutual savings bank and a commercial bank for profit has long been judicially recognized. In *Mercantile Bank v. New York*, 121 U. S. 138, 161, the question was whether a New York statute which exempted savings banks from a State tax to which national banks were subject was unenforceable by reason of a federal statute which prohibited more favorable taxation of financial institutions competing with national banks. The Supreme Court of the United States sustained the State statute, as applicable to national banks, saying,—"No one can suppose for a

moment that savings banks come into any possible competition with national banks of the United States. They are what their name indicates, banks of deposit for the accumulation of small savings belonging to the industrious and thrifty. To promote their growth and progress is the obvious interest and manifest policy of the state. Their mutiplication cannot in any sense injuriously affect any legitimate enterprise in the community." Again, in *Bulakowski v. Philadelphia Saving Fund Society,* 270 Pa. 538, 540, 113 A. 553, the fiscal concept was aptly expressed for this court in the following language: "A savings bank is an institution organized to promote prosperity of persons of small means and limited opportunities, wherein earnings may be gained on aggregate small deposits, which earnings, after deducting necessary expenses, and a reserve for depositors' security, are divided among the depositors. There is no capital stock, nor are there stockholders in such institutions, and it is not a bank *in the commercial sense* of that word" (Emphasis supplied).

Possible competition from the proposed branch appears to be the gravamen of the protesting banks' opposition to its establishment. Even if competition from such source should threaten, that would not go to prove that the existing banking facilities are adequate. But, beyond that, there are only three similar or even partially similar banking services which the local commercial banks and the Saving Fund Society perform, namely, loans on first mortgages on homes, interest-bearing time deposits in the one case and savings accounts in the other and the renting of safe deposit boxes. As already noted, the Saving Fund Society does not offer any commercial banking facilities whatsoever; it does not carry checking accounts; possesses no fiduciary powers; does not solicit and would

not knowingly accept any commercial business; does not make commercial loans of any kind including loans on installment purchases; and does not make personal loans.

So far as mortgage loans on homes are concerned, the Saving Fund Society already owns in the Ardmore community 949 of such mortgages with an aggregate face value of roundly $8,000,000. At the hearing before the Banking Board, a representative of the Bryn Mawr Trust Company testified that his institution had "serviced" over the preceding ten years approximately $55,000,000 of mortgages. But, that argues inadequacy rather than adequacy of the Trust Company's own mortgage-loaning facilities when it is recognized that "mortgages serviced", as defined by the representative, "means that these were mortgages that we placed through our facilities, through our correspondents, insurance companies and whatnot", in other words, brokered them to distant mortgages or assignees. Of course, the Trust Company could not loan on mortgages to such extent. Its investment in mortgages is limited by law to twenty-five per cent of its capital and surplus, which amounted to $1,350,000 at the time of the hearing or to fifty per cent of its time deposits, then amounting to $5,-248,000 (see Section 1012C of the Banking Code, supra).

The interest-bearing time deposits in a commercial bank are far different from the savings accounts of depositors in a mutual savings bank. The commercial bank pays interest on time deposits at a fixed rate and any excess of earnings on such deposits belongs to the stockholders of the bank. The depositor's right to interest is contractually derived and the relationship between the bank and the time depositor is that of a debtor and creditor, whereas in the case of a savings account in a mutual savings bank the increment re-

ceived by the depositor is by way of a dividend upon a distribution of the net earnings of the savings bank after expenses and reserves, and the relationship between the bank and the depositor is that of fiduciary and beneficiary. Moreover, an account may be opened in the Philadelphia Saving Fund Society with a deposit of as little as one cent and, when the account reaches one dollar, it shares in the periodic distribution of the bank's earnings.

The present record evidences that many thrifty persons of small means prefer the advantages offered by a mutual savings bank over those of a commercial bank which is organized and operated for profit. The Philadelphia Saving Fund Society, after operating for years as a savings bank and thrift promoter, has more than 760,000 individual deposit accounts with an average balance in such accounts of less than $950. And, of these accounts, 225,000 (with an average balance of $28 each) are the savings accounts of school children. Over 6,000 of the bank's accounts are of residents of the Ardmore community for a total deposit in excess of $13,000,000,—more, in fact, in total amount of accounts and aggregate of deposits than the interest-bearing accounts of any local bank. While the convenience of customers is not determinative of inadequacy of local banking facilities, it has some bearing when the adequacy of existing banking facilities is appraised with respect to the character of banking service which the proposed branch will afford. Less than four per cent of the deposits in the Philadelphia Saving Fund Society and withdrawals therefrom are made by mail. In other words, ninety-six per cent are made by depositors calling in person at the bank. The significance of this fact becomes apparent when it is realized that there are 6,000 depositors of the Saving Fund Society and approximately 1,000 mortgagors to the Society in the Ardmore community.

The difference between a commercial bank and a savings bank is so important that, in order to preclude prospective depositors from being misled into believing that a commercial bank offers true savings account facilities, a statute of this State (Section 201 of the Banking Code) expressly forbids a commercial bank from using the word "savings" in its corporate name. Other States have acted similarly. For instance, New York has a statute which prohibits any banking institution, other than a savings bank or a savings and loan association, from using the word "saving" or "savings" in its banking or financial business or in an advertisement relating thereto. The validity of the statute was upheld by the New York Court of Appeals in *People v. Franklin National Bank,* 305 N. Y. 453, 460, as being an expression of "an old, wise policy of protecting our citizens against being fooled." The reversal of the decision by the Supreme Court (347 U. S. 373) did not impugn the validity of the statute but merely relieved national banks from its operation because of a conflict with a federal statute. In construing a somewhat similar Act, the Supreme Court of New Hampshire said that "the statute reveals its controlling purpose to be the prevention of deception, fraud, and false representations by persons and corporations in assuming to invest funds deposited with or entrusted to them, under contracts purporting to give the depositors the same advantages and protection afforded by savings banks . . .": *State v. People's National Bank,* 75 N. H. 27, 31, 70 A. 542.

The objecting banks' principal reason for opposing the establishment of a branch savings bank in Ardmore appears to be their expressed fear that such a branch would "drain off many of our depositors", meaning, of course, time depositors since the savings bank accepts no checking accounts. No special knowledge of bank-

ing is needed for one to realize that time deposits are a very important part of a bank's resources. But, the protestants' apprehension rests upon speculation alone and stems from the fact that the rate of interest paid by the local commercial banks on their time deposits is 1% to 1½% while the current rate of dividend paid by the Philadelphia Saving Fund Society on its savings accounts is 2½%. In the light of the present record, that proves absolutely nothing in the way of possibly harmful competition from a branch savings bank. The Federal Savings and Loan Association (already located in the business district of Ardmore) pays 3% on savings accounts, i.e., twice as much as the local commercial banks. Yet, in the face of that fact, during the ten years preceding the year of the hearing before the Banking Board the interest-bearing time deposits in the Bryn Mawr Trust Company increased in number from 3,397 to 5,829, and in total amount from $2,118,000 to $5,248,000. And, during the same period, the time deposits in the National Bank of Narberth increased by $1,000,000. What the proportion of increase was, does not appear from the meagre figures offered by that institution which elected to rest the case on the showing made by the Bryn Mawr Trust Company.

The possibility of competition in the renting of safe deposit boxes is so negligible as not to justify detailed comparison.

In any event, freedom from competition of a proposed branch bank does not spell adequacy in existing banking facilities. The banking laws of the State are not designed to confer monopolies upon fortunately located banking institutions. As Mr. Justice BELL recognized, in speaking for this court in *Delaware County National Bank v. Campbell,* supra, p. 325,—"The legislature . . . did not exclude or intend to exclude competi-

tion between banks; it intended, inter alia, to exclude such competition as would likely weaken or destroy some banks in an overbanked community and thus weaken or injure the entire banking system, to the detriment of depositors, creditors, stockholders and the public alike." On the basis of the record in this case, no such harmful competition is to be anticipated from the establishment of a branch savings bank in Ardmore. Of Pennsylvania's seven mutual savings banks the four located in Philadelphia have for years lived side by side with commercial banks and all have prospered without detriment to either type of banking.

In the light of the evidence adduced at the hearing before the Banking Board, its disapproval of the proposed amendment of the applicant's charter was arbitrary and unwarranted and must, therefore, be reversed.

The order of the Banking Board of Pennsylvania disapproving the application of the Philadelphia Saving Fund Society for an amendment of its articles of incorporation so as to permit it to establish a branch in Ardmore is reversed and the record is remanded with directions that the Banking Board take such steps as may be necessary to evidence its approval of the proposed amendment; each party to bear its own costs.

OPINION CONCURRING IN PART AND DISSENTING IN PART BY MR. JUSTICE BELL:

We decided in *Delaware County National Bank v. Campbell,* 378 Pa. 311, 106 A. 2d 416, that an appeal in the nature of a broad certiorari may be taken to the Supreme Court from an Order of the Pennsylvania Banking Board approving a merger of two banks, the effect of which was to establish a branch bank in a community in a county contiguous to Philadelphia. Appellees contend that this is an appeal from an Order

of the Department of Banking, and since it disapproved the establishment of a branch bank the appeal is in the nature of a narrow certiorari and therefore should be quashed. There is no merit in this contention.

Section 204, F, specifically governs the present case and provides that "the decision of the Banking Board shall be binding upon the Department of Banking." This appeal was in reality from the findings of fact and conclusions of law of the Banking Board, the named defendant in the case, and both appellants and appellees base their entire argument-on-the-merits upon the contention that the Board's findings of fact and conclusions of law should be reversed or affirmed. The Department of Banking was a mere agency or conduit to relay the decision of the Banking Board to the Secretary of the Commonwealth and the parties interested, and the Banking Code being silent on the subject of an appeal in such a situation, an appeal in the nature of a broad certiorari is allowed therefrom. However, even if the appeal were restricted to a narrow certiorari, this would furnish no legal grounds for quashing the appeal.

The merits and the proof.

Section 204, D, of the Banking Code provides that a State Bank "may . . . establish a branch . . . in any place within any county contiguous to the county in which its principal place of business is located, if the city, borough or other community in which such branch is to be established is *without adequate banking facilities*,[1] . . .". Obviously the Society which is seeking to establish a branch has the burden of proving that the community in question is "without adequate banking facilities." The question involved may be thus accurately stated:

---

[1] Italics throughout, ours.

Where, in the community in which the proposed branch bank is to be located, there are commercial banks which the Banking Board found offer *complete* banking facilities *including* the facilities which the applicant proposes to furnish, but there are no mutual savings banks, does the Banking Board of Pennsylvania have to hold as a matter of law that the community was without adequate banking facilities?[2]

The Banking Board, after hearing and testimony, *found as a fact* that the *community* in question *had complete and well-rounded banking facilities* including all the facilities which the Society proposes to offer to the people in that community. No testimony or facts were presented to the contrary and, as we shall see, the Society did not offer a scintilla of evidence to prove that the community was without adequate banking facilities.

The primary business of the Saving Fund Society consists of receiving small deposits for (popularly called) savings accounts, investing the money in United States Government bonds, Corporate bonds and Municipal bonds and in making home mortgage loans. The Statement of Condition of the Philadelphia Saving Fund Society as of June 30, 1954, showed (no savings accounts but) *time deposits* of $717,302,858, and mortgage loans of $235,147,831. Since the majority seems confused on the subject of savings deposits and time deposits, and seems to base its decision mainly on the thesis that only a savings bank has or should have "savings deposits", we point out (a) that savings deposits are often included in and often called time deposits which, although they differ slightly, are basically

---

[2] This is substantially the question as appellant properly propounds it, but it is a question which the majority opinion has evaded or confused.

the same; and (b) the Society's "Statement of Condition" contains no savings (accounts or) deposits but *only "time deposits"*.

The Society is not a commercial bank and does not have any checking accounts. It pays a higher rate of interest on saving accounts than do commercial banks, although not as high as its neighboring Federal Savings and Loan Association; and generally speaking withdrawals can be made in less time than most commercial banks require. These are irrelevant minutiae.

The Society based its case on (1) the argument of "convenience" to its present and future depositors, which of course is neither a factual nor a legal ground or basis to justify its application or satisfy the statutory requirement of "want of adequate banking services"; and (2) on the technical legal argument—which is the only possible basis for the present application—that a mutual savings bank (of which there are *only seven* in the entire Commonwealth) is in many respects different from a commercial bank; ergo the Society is entitled to establish a branch *in any and every community in Pennsylvania* which does not have a mutual savings institution.[3] This latter was a proper legal approach and is we repeat the only ground upon which the appellant could possibly be legally granted the right to establish a branch *in the community in question*.

The Society says it has many customers who live in this area[4] and it would be more convenient for them to make their deposits in a branch bank instead of by mail.[5] Although it is entirely irrelevant and immate-

---

[3] or one that is "adequate to serve the people of the city or borough or community."

[4] Apparently almost all of them work or shop in Philadelphia.

[5] Only 4% make deposits by mail.

rial, it would probably be more accurate to say that it is more customary but not as convenient to deliver rather than to mail your deposit—instead of motoring for miles and trying to find a nearby parking space. However, the Society is correct when it says that an attractive bank building has more appeal or allure than a drab mail box, and is much more likely to attract depositors. The Society further contends that none of the four banks in the community[6] in question furnish the same type of service as does the Society. This is diametrically contrary to the findings of fact of the Banking Board! *Their findings of fact were supported not only by adequate evidence but there was absolutely no relevant evidence to the contrary.* Able legal arguments by able counsel for the Society (even if they were not specious) and an understandable desire on the part of the Society to expand and to furnish additional services to its customers, present and future, do not take the place of factual evidence nor factually prove (as the Society must) that the community in question is *without adequate banking facilities.*

The Banking Board found as a fact, "11. That the aforesaid three banking institutions and the branch office of The Pennsylvania Company for Banking and Trusts offer *complete* and well-rounded banking facilities, *including savings account facilities,* safe deposit boxes *and mortgage loans* and the appellant institution, The Philadelphia Saving Fund Society, propose to offer *additional facilities for savings, home mortgage facilities* and safe deposit boxes." Savings account facilities and mortgage loans are we repeat the very facilities which the Society proposes to supply and which it nec-

---

[6] Eight other banking institutions and associations which were in this geographical area and in this or a neighboring county protested the proposed branch.

essarily has to prove are inadequate in that community. Appellant's position—unlike the confusion which in my judgment permeates the majority opinion—is clear; it boils down to the basic contention that a mutual savings bank of which there are four in Philadelphia and three elsewhere in Pennsylvania—is so essentially different from a commercial bank that unless every community in every County in Pennsylvania has (at least) one mutual savings bank *it does not have adequate banking facilities.* Of course there is not the slightest merit in that contention; moreover, it would not have to be made sur an application for a branch in a community which the Banking Board found did not have adequate banking facilities *of this nature.*

Take, for example, The Pennsylvania Company, a gigantic commercial bank which has a branch in this community and which made no objection to the establishment of the Society's proposed branch. The reason for their failure to object, which the majority opinion completely overlooks, is that The Pennsylvania Company does not seek or want the home mortgage loans nor the savings accounts (or time deposits) which the Society specializes in,[7] and consequently if The Pennsylvania Company were the only bank in the community in question the Society would clearly be entitled to establish a branch therein since the community did not have adequate banking facilities of the nature offered by the Society.

Except for those who have specialized in the field of banking, a Judge knows just as much about banking as a banker knows about law and for this reason it seems

---

[7] It is not necessary to consider the additional contention of the Bryn Mawr Trust Company that The Pennsylvania Company had another reason for not objecting to the proposed branch in that its public history shows it wants to greatly expand not only throughout Philadelphia but in neighboring counties.

necessary to state some of the basic fundamentals of banking in order to expose the errors into which the majority have fallen.

Deposits large and small are the lifeblood of a bank. *Most country banks owe their very existence to savings deposits and home mortgage loans.* The latter situation does not prevail, or prevails only to a very limited extent in a large city. The Statement of Condition of the Bryn Mawr Trust Company, one of the banks opposing the Society's application, as of December 31, 1953, showed total deposits of $20,505,000. composed of 5,829 savings accounts totaling $5,248,000.[8] and 9,473 checking accounts totaling $15,257,000. It owned mortgages (home mortgage loans) totaling $4,892,000. and serviced mortgages totaling $53,635,000. Its total capital and surplus was only $1,350,000.

Every country banker knows from experience (which is why all the country banks far and near protested this proposed branch) what will almost inevitably happen to this little bank when the wonderful giant Society drains off, as it undoubtedly will, a substantial part of the future savings account business and the future home mortgage business of the so-called Ardmore community. Where, as here, *the very existence* of at least one of the little banks and trust companies objecting to the branch depends on their savings accounts and mortgage loans, the Bryn Mawr Trust Company's savings and mortgage business and its net earnings will be very substantially reduced by the invasion of this community by this great savings bank, and it will undoubtedly have to successfully change its rates or the kind of business which has been its life blood, or merge with a larger bank.

---

[8] On January 1, 1955, the Bryn Mawr Trust Company, after merger, held approximately *33% of all its deposit funds as savings deposits.*

Ardmore is not a city or borough or county or a political subdivision, but is a thriving community within the political subdivision known as Lower Merion Township. The Banking Board, which included the Secretary of Banking, and is composed not of inexperienced theorists but of experienced specialists, specifically and unanimously found, inter alia, the following pertinent facts:

"5. That for the purpose of determining adequacy or inadequacy of banking facilities as required by law, Ardmore shall be considered a 'community' and the said 'community' to be tested is recognized by both proponents and opponents as the territory *within a radius of 2½ miles from the site* of the proposed branch office.

"8. That the Ardmore community in the territory within a radius of 2½ miles of the site of the proposed branch office is now serviced by the Bryn Mawr Trust Company, Bryn Mawr; Bryn Mawr National Bank, Bryn Mawr; National Bank of Narberth, Narberth and a branch office of the Pennsylvania Company for Banking and Trusts.

"11. That the aforesaid three banking institutions and the branch office of The Pennsylvania Company for Banking and Trusts offer *complete* and well-rounded banking facilities, *including savings account facilities,* safe deposit boxes *and mortgage loans* and the applicant institution, The Philadelphia Saving Fund Society proposes to offer *additional* facilities for savings, home mortgage facilities and safe deposit boxes."

The Banking Board also made the following important finding which it mistakenly called a conclusion of law:

"3. The State Banking Board concludes that the community of Ardmore now has adequate banking facilities and it does not require additional banking facil-

ities at the present time." Those findings of fact were supported not only by ample and adequate evidence, but there was, we repeat, *not a scintilla of relevant* evidence to the contrary. Those findings of fact are a full, *complete,* direct, absolute and *irrefragable answer* to the present application for a branch bank!

The importance of this case to the small country banks located near Philadelphia makes it wise to examine the reasons given in the majority opinion for their decision, although frankly it is not clear to me on what ground the decision is basically placed.

The majority opinion says "The Banking Board did not find, however, that the banking facilities in the Ardmore community were adequate". In the light of the above quoted findings of the Banking Board— especially number 11 and number 3—could any statement be more specious or more absolutely and completely wrong? Could any findings be clearer or more all-embracing or more complete or more directly rule the instant case than the Board's aforesaid finding of fact, viz., number 11: "That the aforesaid three banking institutions and the branch office of The Pennsylvania Company for Banking and Trusts offers *complete* and well-rounded banking facilities, *including savings account facilities,* safe deposit boxes *and mortgage loans* and the applicant institution, The Philadelphia Saving Fund Society, proposes to offer *additional* facilities for savings, home mortgage facilities and safe deposit boxes." "3. The State Banking Board concludes that the community of Ardmore *now has adequate banking facilities* and it does not require additional banking facilities at the present time."

The majority opinion further states that there was no evidence before the Banking Board from which a finding of adequacy could have been made. They have put the shoe on the wrong foot and the cart before the

horse. The burden of proof was of course on the applicant to establish by testimony or factual evidence that the community in question was "without adequate banking facilities". The Society offered not an iota or scintilla of relevant testimony or factual evidence to factually meet the standard which the Legislature established and required. The Bryn Mawr Trust Company, on the other hand, proved (though it did not have to) exactly the opposite, namely, that it (and other banks in the community) furnished adequate savings account facilities and mortgage loans which the Society proposed to supplement. To say, as does the majority, that "the Banking Board's findings that the community in question now has adequate banking facilities, *was a bald and capricious conclusion without a single finding of fact to support it*" must, on this record, be shocking and appalling to every banker, and is to me incomprehensible.

Upon what else does the majority opinion rely? A substantial part of the majority opinion is devoted to proving the obvious, i.e., a savings bank is different from a commercial bank in a number of important respects. That is undoubtedly a fact, but as far as this case is concerned it proves absolutely nothing! Likewise, the statement in the majority opinion that certain income over expenses is distributed proportionately among the various depositors by way of a dividend is not only inaccurate, no dividends having ever been paid, but what relevant difference does it make *so far as adequate banking facilities are concerned,* whether a dividend is payable to shareholders or to depositors?

The majority opinion also states that no harmful competition is to be "anticipated" since "The four of Pennsylvania's seven mutual savings banks which are located in Philadelphia have for years lived side by side with commercial banks without detriment to either

type of banking." This well illustrates the flimsiness upon which the majority opinion is built. Philadelphia has a population of over two million people in an area of over 129 square miles—what a non sequitur.

In *Delaware County National Bank v. Campbell*, 378 Pa. 311, 327, 106 A. 2d 416, this Court said: "We will not overrule or reverse the Banking Board if there is adequate evidence to support its findings of fact and the proceeding is free from error of law and there has been no clear abuse of discretion. Cf. Rolling Green Golf Club Case, 374 Pa. 450, 458, 97 A. 2d 523." We further said (pages 315, 328): "The Board is composed of experienced and able bankers who should know, if anyone knows, the banking needs of the various communities in Pennsylvania and whether adequate banking facilities do or do not exist. . . . Where a Board is composed of able and experienced experts who are dealing with technical questions, a Court should be loath to find a clear abuse of discretion upon a subject or subjects as to which they are far better qualified than any Court." That language is equally applicable, indeed even more applicable, to the present case. We may appropriately ask: What is the use of having a Banking Board composed of experienced specialists, if a Court inexperienced in the field of banking takes the position that the Banking Board in determining purely banking matters did not know what they were talking about?

The Banking Board's findings of fact were not only supported by adequate evidence but, we repeat, there was no relevant evidence to the contrary. Certainly it is clear and indisputable that there was no abuse of discretion and no error of law. I would affirm the Board's Order.

Mr. Justice MUSMANNO joins in this opinion.