IN THE MATTER OF THE APPLICATION OF HOWARD
SAVINGS INSTITUTION OF NEWARK FOR APPROVAL
OF ESTABLISHMENT OF BRANCH OFFICE AT 27
BLOOMFIELD AVENUE, BOROUGH OF NORTH CALD-
WELL, ESSEX COUNTY, NEW JERSEY.

THE MONTCLAIR NATIONAL BANK AND TRUST COM-
PANY, *ETC.*, AND THE MONTCLAIR SAVINGS BANK,
*ETC.*, APPELLANTS, v. CHARLES R. HOWELL, COM-
MISSIONER OF BANKING AND INSURANCE, *ETC.*,
AND HOWARD SAVINGS INSTITUTION, *ETC.*, RE-
SPONDENTS.

Argued November 10, 1959—Decided March 21, 1960.

30

32

*Mr. John Ferguson* argued the cause for appellant The Montclair National Bank and Trust Company.

*Mr. Ernest F. Keer, Jr.,* argued the cause for appellant The Montclair Savings Bank (*Messrs. Boyd, Dodd, Keer & Booth,* attorneys).

*Mr. William H. Osborne, Jr.,* argued the cause for respondent The Howard Savings Institution (*Messrs. Pitney, Hardin & Ward,* attorneys; *Mr. Waldron M. Ward, Mr. Leslie L. Vanderbilt* and *Mr. Osborne,* of counsel).

*Mr. David Landau,* Deputy Attorney General, argued the cause for respondent Charles R. Howell, Commissioner of Banking and Insurance (*Mr. David D. Furman,* Attorney General, attorney).

The opinion of the court was delivered by

HALL, J.    This appeal challenges a determination of the Commissioner of Banking and Insurance approving the ap-

plication of the Howard Savings Institution ("Howard"), a mutual savings bank with its main office in Newark, Essex County, to establish a branch at 27 Bloomfield Avenue, in the Borough of North Caldwell, in the same county. Appellants, objecting financial institutions in the general area, sought review in the Appellate Division pursuant to *R. R.* 4:88–8 and the appeal was certified on our own motion prior to argument there. *R. R.* 1:10–1(*a*).

The questions raised revolve around the meaning and application of certain of our statutory requirements for bank branches. *N. J. S. A.* 17:9A–19 and 20. These provisions had their origin in the Banking Act of 1946. *L.* 1948, *c.* 67, §§ 19 and 20. *Section* 19, as amended by *L.* 1952, *c.* 220, § 1, deals with basic physical requisites. Beyond situations arising from merger or liquidation not pertinent here, both commercial and savings banks are thereby permitted to establish branch offices in the municipality where the principal office is located or in a municipality in the same county "in which no banking institution has its principal office or a branch office." "Municipality" is defined by the act, in effect, as a political subdivision (*N. J. S. A.* 17:9A–1(10)) and "banking institution" as a state commercial bank or trust company, a savings bank or a national bank (*N. J. S. A.* 17:9A–1(2)). It may be noted that neither state nor federal savings and loan associations are included within the latter definition. There is no dispute that the proposed branch location meets this requirement. There is no bank of any kind in North Caldwell or even a savings and loan association. This section also demands that the savings bank seeking to establish the branch have a specified minimum surplus, which, it is conceded, is amply satisfied here.

The crux of this case relates to the criteria prescribed by *section* 20. It is there provided that before any branch office shall be established, except those resulting from a merger, application shall be made for the Commissioner's approval, which he shall grant, if, after such investigation

or hearings as he "may determine to be advisable," he shall find, in addition to compliance with the requirements heretofore mentioned:

"(2) that the interests of the public will be served to advantage by the establishment of such branch office, and

(3) that conditions in the locality in which the proposed branch office is to be established afford reasonable promise of successful operation."

The Commissioner concluded these requisites had been met after a lengthy hearing at which the applicant and the objectors, appellants and two savings and loan associations who have not appealed, presented full factual and opinion evidence. Before considering the respects in which appellants say the determination is erroneous—and some of the points they raise are of broad and fundamental significance —it is important to summarize the particular physical and economic setting, undisputedly disclosed to the Commissioner by the proofs as a whole.

The location of the proposed branch is near the center of a geographical region commonly known as West Essex. This area, comprising the northwestern corner of the county, has and always has had considerable physical and economic separation and differing characteristics from the heavily urban section to the east. Topography largely accounts for physical separation, the barrier, so-called, being the first ridge of the Watchung Mountains. West Essex extends from this crest five miles or more west to the Morris County boundary and about the same distance from north to south. The densely populated urban section of the county may be said to end with Montclair, which occupies the easterly slope of the ridge.

The area is composed of seven municipalities: Verona, North Caldwell, Essex Fells, Caldwell, West Caldwell, Caldwell Township and Cedar Grove, all of which have been in governmental existence since at least 1908. The first six are closely knit geographically and economically. Cedar

Grove has fewer ties with them and consequently is a less important part of the picture before us. They are almost entirely high type residential communities and small-town rather than urban in character. A large part of the working population commutes to Newark, New York City and other parts of the metropolitan area. Caldwell and, to some extent, Essex Fells have been largely built up for many years and have had less recent population growth. The others, with large amounts of vacant land, have experienced a heavy increase in single-family dwellings and residents since the war. Taken as a whole, the area population has increased about 70%, from 26,985 in 1940 to an estimated 45,886 in 1957. Continued extensive growth is predicted with an expected population levelling off 10 or 15 years hence at approximately 60,000. Most of this future increase will undoubtedly take place in West Caldwell, North Caldwell, Caldwell Township and Cedar Grove where large amounts of vacant land still remain as contrasted with the present almost saturated condition in Caldwell, Verona and Essex Fells.

The area also has considerable independence in the matter of retail trade. The centers are found in the long established business sections of Caldwell, serving all of the Caldwells and Essex Fells, and Verona, serving its residents and part of Cedar Grove, where most of the populace do their ordinary day-to-day shopping and procure their usual services, including family banking. The other municipalities presently have very few retail facilities.

A most important element in this setting is the general mode and main route of transportation binding the whole area together. West Essex is to a very great extent dependent upon the automobile rather than public transportation for all kinds of travel, including commuting and shopping. And the main artery for both local and through traffic, in fact the spinal column of the region, is Bloomfield Avenue, running from Newark and Montclair through the area we are describing to join U. S. Route 46 just over the Morris County line, thereby serving also the central and northern

portions of that county and providing an interstate route west. It is not only the principal route east and west to and from West Essex (except for Cedar Grove which principally uses State Route 23 running northwesterly from Montclair into Passaic County), but also is the main business street of Verona and Caldwell and the site of a shopping center now in the development stage in West Caldwell. Roads to the various residential sections of all the communities lead north and south from the avenue. Counts near the site of the proposed branch established traffic of better than 10,000 vehicles in a ten-hour daytime period.

This brings us more particularly to North Caldwell itself. The shape of the borough resembles an electric bulb with the small base representing the southerly boundary, running along the north side of Bloomfield Avenue for a distance of about 1,100 feet between the westerly line of Verona and the easterly one of Caldwell. In the neck of the bulb are two large Essex County institutions, the penitentiary and the sanatarium, with a third one, the mental hospital, just over the line in Cedar Grove. The largest portion of the borough's area where its residential districts are found lies in the bulbous part to the north. Mountain Avenue, one of the three main roads from this residential section to Bloomfield Avenue, enters that highway within Caldwell about 400 feet west of the branch site. Its 1957 population was estimated at 3,094, a 60% increase since 1950. A further 100% rise was predicted within the next 15 years. It has practically no shopping facilities. Its residents are entirely dependent upon motor vehicles and shop and bank primarily in Caldwell. Essex Fells, a smaller municipality of about 2,000 people, which also has no financial institution of any kind, is somewhat similarly shaped but oppositely located, with the narrow base forming its northern boundary running along the south side of Bloomfield Avenue across from the North Caldwell line. Access to the avenue is had either in the center of Caldwell or just over the Verona boundary.

The proposed location lies on the north side of the avenue about midway of this North Caldwell frontage. The section is not now a general retail area, land uses being mixed residential and commercial. The opposite Essex Fells frontage is occupied by railroad tracks. The site is about equidistant from the business centers of Verona on the east and Caldwell on the west, approximately a mile from each. The new West Caldwell shopping center is a mile or so further west and the Morris County line an additional similar distance. The business section of Montclair is over the ridge about three miles east. A circle, with its center at the proposed location, a radius of two miles and bisected by Bloomfield Avenue, includes most of West Essex.

Present financial institutions in the area comprise: two commercial banks in Caldwell, both former local institutions but now branches (by merger) of Newark banks and both having substantial savings departments; one commercial bank in Verona, also formerly a local bank and now a branch of appellant Montclair National Bank and Trust Company ("Montclair National"), also with time deposits; two state savings and loan associations in Caldwell, who were objectors but are not appellants; and one state savings and loan association in Verona. A branch commercial bank and a state savings and loan association in Cedar Grove were not considered to have any particular bearing. In addition Montclair National has authority and is now constructing a branch at the West Caldwell shopping center. With this exception, all of the institutions were established long prior to the recent development period. All have been and are successful and have shown rapid growth in deposits in late years consistent with the local expansion. The total savings deposits of all are close to $20,000,000. There is no mutual savings bank in West Essex and, outside of the West Caldwell branch, there has been no new bank or branch office established in the trading area for many years.

Appellant Montclair Savings Bank ("Montclair Savings"), the sole mutual savings bank in the picture, has its only

office in the business center of Montclair, but some 12%
of its $37,700,000 of deposits are those of West Essex resi-
dents, including school savings accounts from most of the
area schools. Montclair National has its main office and
three branches in that municipality in which, apart from
the Verona branch, savings of West Essex people aggregate
over $2,000,000. A sizeable federal savings and loan asso-
ciation is also located there.

██ Certain well-known modern banking fundamentals
which were implicit in the presentation before the Commis-
sioner and his findings should be mentioned. A mutual
savings bank is a different type of financial institution from
a commercial bank. Its purpose has frequently been stated
as encouragement of thrift by mutuality of ownership. It
has no stockholders. The profits from its operations not
retained for surplus are divided among its depositors in
the form of percentage dividends periodically declared, popu-
larly referred to as "interest." *N. J. S. A.* 17:9A–186.
Its investments are limited largely to selective bonds, first
mortgages on dwellings under strictly defined conditions,
and secured loans on accounts and certain types of securities.
*N. J. S. A.* 17:9A–174 to 183. By reason thereof it is
permitted to pay, and customarily does, a rate of "interest"
½ of 1% or so higher than is allowed to commercial banks
on time deposits. Such time deposits are important, how-
ever, to the scheme of operations of suburban and small
town commercial institutions and generally constitute half
or more of the total deposits in these banks. They compete
with the savings banks by offering additional types of bank-
ing and services. State and federal savings and loan asso-
ciations, which have grown tremendously in recent years
and are today in effect savings banks, furnish the greatest
competition for the savings dollar since they generally pay
a fraction more in dividends to members even than a savings
bank. The latter competes by attempting to offer the cus-
tomer more and wider services and conveniences. All com-
pete with each other in seeking mortgage loans, the principal

investment of savings institutions and an important asset class of commercial banks in smaller communities.

It was also conceded on all sides that the principal sphere of influence of a financial institution from which the vast majority of its business must come is measured, in an area of the type here involved, by a two mile radius from the institution's location, subject to some variation by reason of particular trading and transportation patterns. To put it another way, individual and family banking in residential communities is primarily done within the same general area in which day-to-day shopping is pursued and as can be conveniently reached by automobile.

■ Howard, of course, had the burden to establish that the statutory requisites were met. Its presentation was on the theory that the requirements of *section* 20 should be determined from the standpoint of an area measured by the two mile radius from the site and not confined to the territory solely within the political boundaries of the Borough of North Caldwell. In fact, it did not seriously attempt to show that a branch would be feasible based on patronage of that municipality's residents alone. Obviously, by reason of the central highway location, it expects to obtain its business from all the West Essex communities and perhaps even some from Morris County residents using Bloomfield Avenue for auto commuting to the metropolitan area. (There is no bank in Morris County for ten miles beyond the Essex boundary, and one of the Caldwell savings and loan associations has a very substantial number of accounts of Morris residents.) Howard showed a high percentage of favorable interest among a sampled group of families living in four municipalities within a close radius and presented a municipal blessing in the form of a resolution of approval adopted by the governing body of North Caldwell. Non-resident employees of the nearby county institutions, totalling several hundred, were suggested as a further source of customers.

It was particularly stressed that Howard already has 1,061 depositors in its main office and present branches in Newark

and South Orange, with accounts totalling $2,900,000, who live within the two mile zone, 80% of whom experience was said to indicate would in time transfer their accounts to the proposed branch. The bank also presently holds mortgages aggregating $3,200,000 on 273 properties within the radius. Successful operation was predicted by estimated figures based on the bank's prior experience following the establishment of its other branches. The computations projected deposits of $2,000,000 after the first year of operation with earnings thereon adequate to pay all expenses and current dividends to depositors and still leave a surplus. These figures were not substantially challenged by the objectors since, as will be pointed out, their approach to the matter of operational promise was on an entirely different theory.

Finally, Howard emphasized the services the branch would furnish, the most significant of which, beyond the higher "interest" rate paid over that of area commercial banks, was the provision to be made for off-street parking and a drive-in teller window. None of the present institutions located in congested business sections of Caldwell, Verona and central Montclair have such facilities, except one Caldwell savings and loan and the new West Caldwell branch of Montclair National. In this motor age these conveniences are admittedly important factors in obtaining and retaining customers. Other services to be rendered by the branch are of less significance, being also generally furnished by the commercial banks and to some extent by the savings and loan institutions: personal checking accounts, vacation and Christmas clubs, school savings accounts, conventional and insured mortgage loans, personal loans secured by pass-books, life insurance policies and securities, safe deposit boxes, sale of savings bonds and travelers' checks and trust services.

The objectors took the position that at least the spirit of the requirement of *N. J. S. A.* 17:9A–20(3) that conditions *in the locality* of the branch afford reasonable promise of successful operation should be interpreted here to mean

conditions only in and confined to the municipality, *i. e.,* North Caldwell, in which the branch is to be located. Their proofs were geared to this interpretation and so there was little or no direct clash with those offered by Howard. They sought to show that on such a basis the branch would have deposits from North Caldwell amounting only to $300,000 at the end of one year and to approximately one and one-half million at the end of five, so that there was not reasonable promise of successful operation.

Their evidence also was directed to the proposition that present banking facilities in West Essex and Montclair are adequate to serve all the needs of the population and therefore it is not in the interests of the public, within the intent of *N. J. S. A.* 17:9A–20(2) to permit an additional competing facility which would siphon off some present savings deposits. On this aspect they in effect conceded the success of a Howard branch at the requested site drawing customers from all of West Essex. Their evidence did not purport to show, however, that the solvency or present healthy condition of any financial institution in the area would be at all endangered. The most their proofs might be said to demonstrate was that some savings depositors in existing institutions would probably transfer their business to the new branch and that the recent rapid rate of savings growth by such institutions might be considerably slowed in the future because of the additional competition. Their witnesses admitted the convenience of the proposed office would be an advantage to many people in the area.

Montclair Savings also based its opposition on a claim that the territory was reserved to it for future growth and so it should be protected against the intrusion of any other savings bank. An expert for the objectors testified that the Montclair institutions could not expect to attract much business to their offices in that town from people living farther than two miles away.

These contentions, inferentially rejected by the Commissioner, form the basis of the broad legal questions raised

by appellants. Their general importance and fundamental impact here dictate that we consider them at this point.

Dealing first with the "locality in which the proposed branch office is to be established," prescribed by *N. J. S. A.* 17:9A–20(3) as the geographical area within which reasonable promise of successful operation of the branch must be found, we have no doubt the Legislature did not intend that it be territorially coterminous with the "municipality" referred to in *N. J. S. A.* 17:9A–19, *subd. B*(3) where non-existence of any banking institution must occur as the primary requisite for a branch. The statute does not attempt to define "locality" at all; as we have said, "municipality" is explicitly specified to mean a political subdivision. It seems obvious, if it was intended the words should be interpreted synonymously, that the Legislature, in such a comprehensive and carefully drawn enactment as is the Banking Act of 1948, would either have used "municipality" in *section* 20 or defined "locality" in the definition section to have an identical meaning. "Locality" has no precise connotation as does "municipality." It is susceptible of broader or narrower limits, depending on the context. Its frame of reference in common usage is nebulous rather than exact and is akin to "vicinity," "neighborhood" and "community." *Cf. Lukens Steel Co. v. Perkins,* 70 *U. S. App. D. C.* 354, 107 *F. 2d* 627 (*D. C. Cir.* 1939), reversed on other grounds 310 *U. S.* 113, 60 *S. Ct.* 869, 84 *L. Ed.* 1108 (1940).

Analysis of the entire act demonstrates a common language pattern convincingly indicating the legislative will that determination of probable success, or for that matter of advantage to or interest of the public, in the establishment of any new financial institution or branch or a change of location shall not be confined to the effect within the artificial and unrealistic limits of political boundaries, but rather on the effect in the general area, vicinity or community to be served and from which business would normally and naturally derive. It might be parenthetically noted that the Supreme Court of Pennsylvania has reached the same conclusion in

construing the synonymous key word "community" found in the banking law of that state. *Upper Darby National Bank v. Myers,* 386 *Pa.* 12, 124 *A.* 2d 116 (*Sup. Ct.* 1956). *Cf. Wyandotte Savings Bank v. Eveland,* 347 *Mich.* 33, 78 *N. W.* 2d 612 (*Sup. Ct.* 1956); see also *Stokes, "Public Convenience and Advantage in Applications for New Banks and Branches,"* 74 *Banking Law Journal* 921, 932 (1957).

While this concept is differently expressed in the various statutory sections, this fundamental meaning shines through clearly in all. In *N. J. S. A.* 17:9A–11, dealing with the requirements to charter a new commercial or savings bank, conditions "in the *locality in which the proposed bank or savings bank will transact business*" must afford reasonable promise of successful operation. *Subsection D*(2). (Italics throughout are ours) If the bank is to exercise trust powers, the same section (*subsection C*(1)) enjoins the Commissioner to consider "the needs *of the community* for trust services." At this point it may be observed that if "locality" or similar broad terms are to be limited to "municipality," a new bank could never be chartered to serve a cluster of adjoining small political subdivisions having no banking facilities, no one of which being alone able to generate sufficient business to afford successful operation, but all together very amply doing so and thereby enabling the creation of needed financial services for the benefit of the whole.

The same thought runs through the provisions dealing with change of location of principal office or branch. If a change is sought before the entire capital of a new institution has been paid, the Commissioner, before permitting it, must be satisfied that "the *area which would be served* by such office if such change were made would be substantially different from the *area which would be served* by such office if no change were made." *N. J. S. A.* 17:9A–12, *subd. B*(1). The legislative distinction is made especially plain by the provisions relating to change of location of main office or branch of a bank already in operation to another site *"within the same municipality."* In such case permis-

sion shall be granted if *"the area which would be served by such office after its change in location would not be substantially different from the area theretofore served."* If the proposed location is so far removed from the place then occupied that *"the area which would be served"* would be substantially different, approval shall not be granted unless "the interests of the public will be served to advantage by such change in location and  *  *  * conditions *in the locality to which removal is proposed* afford reasonable promise of successful operation." *N. J. S. A.* 17:9A–22.

Further support for our conclusion is furnished by analogous provisions in the act concerning savings and building and loan associations. With respect to the establishment of new associations, "benefit to the *area proposed to be served"* is one of the criteria specified. *N. J. S. A.* 17:12A–16.1. As in the Banking Act, branch offices are basically permitted in the "municipality" where the principal office is maintained and in any other "municipality" in the same county in which no principal or branch office of any other state or federal association is in operation. *N. J. S. A.* 17:12A–21, *subd. A*(3). While "municipality" is not specifically defined in this act, it seems clear a political subdivision is likewise meant. Again comparably to the provisions of the banking law, the Commissioner must determine, before granting branch approval, that maintenance of the proposed office "is in the public interest and will be of benefit to the *area served* by such branch office  *  *  * and that conditions in the *area to be served,* afford reasonable promise of successful operation." *Subsection A*(4). Almost identical language is used in setting forth the tests to be applied on applications for change of principal office location. *N. J. S. A.* 17:12A–24.

So it is apparent to us by statutory analysis alone that "locality," "area to be served," "community" and like expressions are intended to express synonymous meanings akin to "trading area" and distinct from that assigned to "municipality." While this question has heretofore not been ex-

pressly passed upon by this court, the result we reach here tacitly underlay our decisions in *Elizabeth Federal Savings & Loan Association v. Howell*, 24 *N. J.* 488 (1957) and 30 *N. J.* 190 (1959), and is in accord with *Household Finance Corporation v. Gaffney*, 20 *N. J. Super.* 394 (*App. Div.* 1952), affirmed 11 *N. J.* 576 (1953). There, the Appellate Division, in construing the requirement of promotion of "the convenience and advantage of the community" for a license to operate a small loan business under the statute regulating that kind of enterprise (*N. J. S. A.* 17:10–5(*b*)), held that "community" could not be confined to municipal boundaries but connoted "area to be served" or "trading area" as determined by the facts in the particular case.

It is, of course, the function of the legislative branch of government and not that of the Judiciary to prescribe the conditions and methods upon and by which new financial institutions may be chartered or branches of existing ones established. When the Legislature has spoken plainly, as here, it is not our province to question the wisdom of the prescribed requirements but only to apply them to the facts of a particular situation brought before us.

Evident from the statutes is a fundamental distinction between the basic physical requisites for a new bank or savings and loan association and for a branch office. The former can be established in a political subdivision where another similar institution already exists; a branch cannot be, although it may be permitted in the next municipality and thereby compete. We see no reason why the Legislature cannot so differentiate if it chooses to do so or why it may not use the economically artificial municipal boundary as the preliminary measuring rod. There is the advantage of initial certainty. Moreover, a new bank is an expensive undertaking and is generally proposed or organized by local people in response to some local need for additional banking facilities, fairly broadly felt and with sufficient depth to warrant the capital risk. The statutory scheme quite properly

gives preference here to local interests organizing the new facility as against an out-of-town institution seeking to seize the opportunity to establish a branch and thereby compete in close quarters with a bank already in existence. By the same token, where there is legitimate room in an area for further banking facilities, it is entirely reasonable to say that establishment of a competing outside branch should not be permitted right next door, so to speak, to the established institution, but that competition may be allowed, if in the public interest, from a location across the municipal boundary. Also, some municipalities in need of banking facilities may not have sufficient local capital or potential to justify creation of a new institution but their need and convenience may be adequately met by the maintenance of a less expensive branch. *Stokes, supra, 74 Banking Law Journal,* at *p.* 927. It is well known that branch banking is a controversial subject, substantially not permitted in New Jersey outside the municipality of the principal office until 1948, and it seems apparent that the Legislature, in prescribing the physical scheme it has, adopted a compromise between competing interests in the banking field, which was entirely within its power to do.

It is indeed most appropriate that the vital questions of public interest and probable success be viewed without regard to mere artificial lines. Banking, like any business and most human activity these days, is not and should not be confined by political boundaries. *Cf. Duffcon Concrete Products v. Borough of Cresskill,* 1 *N. J.* 509, 513 (1949). Realism is the sounder basis of any substantive test. In banking that is best indicated by conditions in and of the whole area which the proposed institution or branch would normally expect to draw upon and serve. Again we cannot quarrel with the basis prescribed by the Legislature, either alone or in conjunction with the initial municipal requisite.

■■ Appellants suggest in effect that, granting all we have said, the peculiar geographical situation of North Caldwell, with its southern boundary constituting the side

line of Bloomfield Avenue and its main population some distance away, a perversion of the purpose of the statutory requirements would result if this branch is allowed. The point is that its probable success will actually be occasioned by its location on a through highway and close proximity to the business centers of Caldwell and Verona where the law forbids it to be situate.

The answer to us is plain. The Legislature has expressed its intent most clearly, and to accede to appellants' urging would be to flout the legislative will. For the Judiciary to say that in one case in which these specific statutory requirements are met a branch will be allowed, but not in another, would be entirely unjustifiable. Where the particular requirement is precise and of all-inclusive application, there is no leeway for statutory interpretation and discretionary treatment. Moreover, meritoriously speaking, it is the benefit to the public in the whole trading area which is the paramount consideration, and location at any statutorily permitted site therein is entirely consonant with and in aid of this overall legislative purpose.

The requirement of *N. J. S. A.* 17:9A–20(2) that the "interests of the public" be "served to advantage" by the establishment of the proposed branch is. obviously a broad standard. Incidentally it may be noted that appellants do not contend that compliance with this criterion is to be judged only by reference to the municipality of location. Unquestionably it is an area concept. Almost identical language is found throughout our banking laws to specify a principal test to be applied by the Commissioner in passing on applications for new banks and savings and loan associations as well as for branches and changes of location.

The obvious emphasis is pointed at benefit to the *public* and not at advantage to any banking institution, be it applicant or established objector. *Cf. Family Finance Corp. v. Gaffney,* 11 *N. J.* 565 (1953) ; *In the Matter of the Application of Millburn-Short Hills Bank,* 59 *N. J. Super.* 470 (*App. Div.* 1959). It will be noted there is no

express mention of so-called adequacy of present banking facilities, which is the criterion in some states, *e. g.,* Pennsylvania. See *Philadelphia Saving Fund Society v. Myers,* 383 *Pa.* 253, 118 *A. 2d* 561 (*Sup. Ct.* 1955). The breadth of the test negatives monopolistic right in existing institutions. *Stokes, supra,* 74 *Banking Law Journal,* at *p.* 929. As Chief Justice Vanderbilt said in the first *Elizabeth Savings* case, *supra:* "The banking laws are regulatory in nature, enacted for the protection of the public, and are in no way designed to give exclusive benefits to institutions who have been granted license to conduct the business of banking." (24 *N. J.,* at *page* 503) Even under the more narrowly expressed Pennsylvania standard, the same result obtains, as was held in *Myers.*

We have recently had occasion to comment on the meaning of "public interest" in parallel sections of the savings and loan law and it is equally applicable here. The decision was the second *Elizabeth Savings* case, *supra,* where it was expressed this way: "It acquires content from the overall objective of the statute to achieve a sound banking structure, healthily competitive, and fully adequate for the needs of the community." (30 *N. J.,* at *page* 194)

The three elements there specified must be the vital factors in the Commissioner's determination of whether "the interests of the public will be served to advantage." They necessarily require consideration of existing institutions and their adequacy as well as the effect of an additional facility on them, but absolute public necessity for further facilities is not essential. The public should always be entitled to increased interest rates and greater services and convenience which proper competition may well bring. Mere sufficiency of existing facilities in the sense of some existing banking facilities, more or less appropriately located in an area and furnishing the usual gamut of services, is not in and of itself sufficient basis to deny establishment of a new institution or branch if the general economy of the area and its reasonable potential are such that there is

room for a further installation without causing excessive competition with real harm to any institution or unduly affecting the banking structure at large. We, therefore, cannot agree with appellants' contention that such mere adequacy absolutely precludes any requested new facility meeting the test of service of the interests of the public to advantage. Nor can we see any justification whatever for the suggestion of Montclair Savings that it is entitled to be protected from competition in an area which it conceives to belong solely to it for future growth.

All this does not mean, however, that the Commissioner will comply with the statute and fulfill his duty by willy-nilly granting applications for new institutions or branches merely for the sake of providing competition. His responsibility is a heavy one and calls for the vigilant and conscientious exercise of his presumed expert knowledge and judgment in every case to avoid the evils of the past and maintain at all costs a sound banking structure in which the public has complete confidence. To quote again from the first *Elizabeth Savings* case, "* * * if one banking institution should fail in the community as the result of an ill-advised burdening of the existing competitive environment, other financial institutions do not continue unaffected." (24 *N. J.*, at *page* 501.)

This leads us to discuss another broad objection made by appellants. They say the Commissioner cannot legally ignore, in determining advantage to the public interest, the effect of the proposed branch on established savings and loan associations in the area and that he did not here in fact consider such effect. While the Commissioner suggests we should not consider the point because the objecting associations have not appealed and errors affecting non-appellants may not be urged by others (*cf. State v. Otis Elevator Co.*, 10 *N. J.* 504, 511 (1952)), we conceive the claim of error to rest on a wider base properly open to appellants to present.

State and federal savings and loan associations have assumed in this country in recent years a major position in the financial world as depositaries for people's savings and otherwise, and have enjoyed a phenomenal growth. According to figures of the Federal Home Loan Bank Board, their deposits increased almost eight fold in the 15-year period from 1940 through 1955 as contrasted with less than a tripling of mutual savings bank deposits over the same length of time. As long ago as December 31, 1955, savings and loans deposits aggregated $32,300,000,000, whereas those of the mutual savings banks totalled only $28,200,000,000. 20 *Encyclopedia Brittanica, Savings Banks* 19 (1959 *ed.*). While in New Jersey these associations have not generally attained the size of banks except in our larger cities, they exist in almost every community and are not an insubstantial factor in practically every local banking picture. Despite the fact the Banking Act does not classify them as a "banking institution" (*N. J. S. A.* 17:9A–1(2)), the existence of which would preclude the establishment of a branch bank in a municipality (*N. J. S. A.* 17:9A–19) or give them the right to notice of an application for a new bank (*N. J. S. A.* 17:9A–10), we think their existence and effect must be duly considered in connection with any determination of advantage to the public interest and reasonable promise of successful operation of a proposed new facility. See *Stokes, supra,* 74 *Banking Law Journal,* at *p.* 933. Such is implicit in the holdings of the two *Elizabeth Savings* cases, *supra* (24 *N. J.* 488 and 30 *N. J.* 190).

But we are of the opinion that the Commissioner in the instant case did in fact give sufficient recognition to the interests and place of the area associations in the whole picture. Two participated actively in the hearing and another objected by letter. The Commissioner was fully advised of the facilities, services, assets and growth of the participants and expressly stated in his findings that he had "carefully considered the merits of their objections." The evidence on their behalf did not disclose any specific objec-

tion or claimed adverse effect except to indicate in the case of one the possibility of curtailment of a proposed addition to its physical plant because of expected increased competition if the requested branch be approved.

Finally we come to the attack by Montclair Savings on the findings underlying the determination appealed from. It is first claimed the Commissioner failed to make basic findings of fact to support his ultimate statutory conclusions in favor of Howard's application.

It is axiomatic in this State by this time that an administrative agency acting *quasi*-judicially must set forth basic findings of fact, supported by the evidence and supporting the ultimate conclusions and final determination, for the salutary purpose of informing the interested parties and any reviewing tribunal of the basis on which the final decision was reached so that it may be readily determined whether the result is sufficiently and soundly grounded or derives from arbitrary, capricious or extra-legal considerations. *New Jersey Bell Telephone Co. v. Communication Workers of America,* 5 *N. J.* 354 (1950); *cf. Grundlehner v. Dangler,* 29 *N. J.* 256, 271–272 (1959).

The nature and technical as well as substantive sufficiency of such findings will necessarily depend on the nature of the matter and the proofs. Here legal questions, previously considered, were actually the main bones of contention. There was really no *basic fact* in issue. It is not a case where the evidence was in sharp conflict so the Commissioner did not have to choose between opposite testimonial versions. Only on the question of probable success was there factual dispute and there, as we have pointed out, variation resulted from the differing legal theories relied upon by the parties. The basic facts consisted, in the main, of factual data, about which there was little or no controversy, covering a wide range of geographic and economic factors. The real matters in issue, once a point of view had been mentally reached on the underlying legal questions, were the so-called ultimate facts or statutory conclusions, essen-

tially matters of opinion and judgment to be arrived at by the Commissioner from the factual materials. In such a situation, the function of basic findings is, broadly speaking, to show how and why the Commissioner made up his mind the way he did. All of the evidential data need not be repeated or even summarized, nor need every contention be exhaustively treated. It is sufficient if it can be determined from the document without question or doubt what facts and factors led to the ultimate conclusions reached.

While the findings here, considered in the light of the principles just mentioned, are not nearly so clear, full and well organized as one reasonably has the right to expect from a state agency as experienced and important as this one, we should not impede the administrative process and delay final disposition unless such is absolutely necessary to insure a just and proper review. If it is apparent that we and the interested parties can and do understand fully the meaning of the decision and the reasons for it, no sufficient reason exists to remand for fuller and clearer findings and later reconsideration. *In re Greenville Bus Co.,* 17 *N. J.* 131, 147–148 (1954). That would ultimately amount to no more than what Mr. Justice Frankfurter has called "marching the king's men up the hill and then marching them down again * * *" *City of Yonkers v. United States,* 320 *U. S.* 685, 694, 64 *S. Ct.* 327, 88 *L. Ed.* 400, 405 (1944) (dissenting opinion).

█ And we are of the opinion that the Commissioner's narrative findings, in spite of their deficiencies, are minimally adequate to comply with the technical requisites in the circumstances of this case. The controlling considerations, the parties' positions thereon and the Commissioner's views are not left in any doubt, although somewhat vaguely and negatively expressed. As we have said, implicit throughout is his concurrence in Howard's view (which we have approved) on the fundamental legal questions. Compliance with the basic physical requisites is shown. He points out the geographic and economic situation in general, which we have

earlier detailed from the evidence, and indicates the probable success of the branch in serving not only North Caldwell and Essex Fells but also all of West Essex by reason of the favorable location, area population and growth prospects, and the number of present Howard depositors living in the area to be served. He notes advantage to the public interest not only from the same factors but also because of the convenient services Howard proposed to offer and because of absence of a savings bank in the area, which is pointed out as a type of institution distinct from a commercial bank. He finds no "unfair" (in the sense of harmful) competition with the existing commercial banking facilities, described as excellent, and, as earlier pointed out, consideration of the objections of the savings and loan associations did not indicate any different result in this respect. He comments on the desirability of reasonable competition for the savings dollar, which he says does not necessarily adversely affect existing banks but frequently leads to an increase in the deposit potential of all banks in an area. The inference of safe room for a competing savings facility is irresistible. Therefore, he concludes, the ultimate statutory requisites have been met.

Montclair Savings also urges the ultimate findings were not supported by the evidence. Much of the argument really relates to appellants' views on the underlying legal issues which we have earlier held to be without merit. In any event, we are entirely satisfied that the Commissioner's conclusions are eminently supported by the evidence under the well established principles governing judicial review of the acts of administrative tribunals. *In re Greenville Bus Co., supra; In the Matter of the Application of Millburn-Short Hills Bank, supra; In re Application of Hackensack Water Co.*, 41 *N. J. Super.* 408 (*App. Div.* 1956). In this connection it may well be mentioned that evidence to sustain an applicant's burden that there is safe room for a competing facility and that harmful effects will not result and, conversely, proofs by objectors suggesting an opposite conclu-

sion concerning this most important element must generally be indirect and circumstantial. On most occasions they will necessarily take the form of full presentation of data bearing on the present and probable future economics of the area in all aspects, on the basis of which the Commissioner must form an expert opinion on this very sensitive factor. We think Howard's presentation here was adequate to meet its burden and so the Commissioner's conclusion was sufficiently grounded in this respect.

The determination of the Commissioner is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.

*For reversal*—None.